## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Michael Calabrese, (R02523),    )
    )
        Petitioner,    )
    )      Case No. 14 C 0790
      v.    )
    )      Judge Sharon Johnson Coleman
    )
Rick Harrington, Warden,    )
    )
        Respondent.    )

## MEMORANDUM OPINION AND ORDER

Petitioner Michael Calabrese, a prisoner at the Menard Correctional Center, brings this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging his 2008 murder conviction from the Sixteenth Judicial Circuit Court, Kane County, Illinois. Petitioner argues that: (1) the trial court erred in allowing the prosecution to call his brother, Patrick Calabrese, as a witness at Petitioner's trial because Patrick Calabrese invoked his Fifth Amendment right against self-incrimination before the jury; and, (2) ineffective assistance of appellate counsel for failing to raise on direct appeal: (a) the trial court's denial of a cross racial witness identification jury instruction; (b) the trial court's refusal to allow Petitioner to introduce Cedric Walker's prior convictions for impeachment purposes; (c) destruction of exculpatory evidence by Detective Gerleman; (d) Detective Galason's perjured testimony; and (e) the state's withholding of material evidence. The Court denies the petition and declines to issue a certificate of appealability.

## 1.    Background

The following facts are drawn from the Appellate Court of Illinois's opinion on direct appeal. *Illinois v. Calabrese*, 924 N.E.2d 6 (Ill. App. Ct. 2010). The state court findings are presumed correct, and Petitioner has the burden of rebutting the presumption of correctness by clear and convincing

evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)). Petitioner provides no evidence to rebut the state court findings.

Following a jury trial, Petitioner was convicted of first degree murder for the shooting death of Edmund Edwards during a dice game at the Foxview apartment complex in Carpentersville, Illinois. 924 N.E.2d at 8. Foxview consists of 23 two-story residential apartment buildings. *Id.* at 9.

On May 1, 2005, at approximately 2:45 a.m., two Carpentersville police officers were completing an unrelated traffic stop a quarter of a mile from the apartment complex when they heard a gunshot coming from the direction of the complex. *Id.* at 9. The officers discovered the victim lying on the ground unresponsive between two parked minivans in a grassy median. *Id.* The victim had $140 in cash in left hand, and an additional $670 in cash in his pocket. *Id.* at 9-10. The area was "fairly well lit." *Id.* at 9. An autopsy showed that Petitioner was killed by a gunshot that entered through the left side of the middle of his back. *Id.* at 14. The bullet struck various organs before penetrating his heart. *Id.*

Ernest LeFlore, a complex resident, joined the dice game between midnight and 1:00 a.m, but lost his money. *Id.* at 10-11. While playing in the game, he saw five people shooting dice including the victim. *Id.* at 10. LeFlore saw Petitioner standing against a wall during the game. *Id.* LeFlore recounted that Petitioner said during the game that, "whoever wins the dice game is going to get stuck up." *Id.* LeFlore explained that he looked at Petitioner more during the game after he made the comment. *Id.*

LeFlore went to sit in his car after he lost in the dice game. *Id.* at 11. He explained that he left because "the dude sa[id] he was going to stick the game up and I got scared." *Id.* Approximately 20 minutes later, LeFlore witnessed Petitioner walk away from the game, and then return five minutes later in a hooded shirt and a face mask. *Id.* Despite the fact that Petitioner had a face mask on, LeFlore

could still identify Petitioner because Petitioner was wearing the same clothes. *Id.* Petitioner was one of two or three "white guys" at the dice game, and this made him stand out. *Id.*

LeFlore saw Petitioner walk up to the victim. *Id.* Petitioner was holding a black revolver (LeFlore said it looked something like .38 special), and told Petitioner to "give me that shit." *Id.* Petitioner and the victim then walked towards a van that blocked LeFlore's view. *Id.* LeFlore heard a loud bang and everyone in the area, including LeFlore, started running. *Id.* LeFlore saw Petitioner running away from the scene. *Id.* Petitioner then got into a small car that was waiting in the area. *Id.*

LeFlore admitted that he smoked about half an ounce of marijuana that night, but the marijuana did not impair his ability to observe or recall events. *Id.* He smoked marijuana on a daily basis, but denied smoking it the day he testified, or the day before. *Id.* However, he could not remember "that far back" regarding whether he smoked marijuana two days before he testified. *Id.*

LeFlore admitted that he had difficulty identifying the area that the crime occurred in photographs that were taken on the evening of the shooting. *Id.* He also denied making various statements to the police including a statement that he allegedly told the police that "Big Pun" was the man standing against the wall. *Id.* Petitioner also explained that the police showed him photographs the day after the shooting, and he picked three Hispanic men as the possible offender. *Id.* Petitioner is of Hispanic and Italian descent. [5 at 10].

Angela Lewis, a complex resident, walked out of her apartment at approximately 1:00 a.m. and witnessed the dice game. *Id.* at 12. She stayed outside for a period talking to another resident named Jefferson. *Id.* Lewis saw the victim shooting dice in the game. *Id.* She also saw Petitioner located by the dice game, but he was not shooting dice. *Id.* Lewis knew Petitioner from the apartment complex. *Id.* Lewis did not see Petitioner walk away from the dice game. *Id.*

However, Lewis did see Petitioner shoot the victim. *Id.* She explained that she saw fire come from Petitioner's left hand when Petitioner shot the victim. *Id.* She also saw Petitioner flee the scene, and she selected Petitioner's picture from a police photo array two days after the shooting. *Id.* Lewis explained that Petitioner was wearing a face mask, but she was still able to identify him because the mask did not cover his entire face. *Id.*

Lewis had originally walked out of her apartment in a hope that Jefferson would drive her to the store so that she could buy beer. *Id.* However, Jefferson refused. *Id.* Lewis said she did not drink when she watched the dice game and shooting. *Id.* She also said she did not see others drinking or smoking marijuana. *Id.* Lewis conceded that she initially lied to the police by saying she did not see anything. *Id.* at 13.

On cross examination, Lewis admitted that her in-court testimony was the first time she said she was outside when the shooting took place. *Id.* She admitted that she did not give her full story to a defense investigator who spoke to her a week before she testified, but she explained it was because she was scared. *Id.* Lewis had previously said she witnessed the shooting from inside her apartment instead of outside. *Id.* She was consistent in saying she witnessed the shooting, the change was her location of where she witnessed the shooting. *Id.*

Cedric Walker arrived at the complex at 9:30 p.m. on the evening before the shooting to visit his cousin and girlfriend. *Id.* Walker did not live in the complex, but was a frequent visitor because his cousin, as well as the mother of his children, both lived there. *Id.*

Walker sat outside and watched the dice game while he consumed two beers. *Id.* He estimated that he was 43 feet (approximately the same distance to the back wall of the courtroom) away from the dice game. *Id.* He denied participating in the game, but said he was close enough to see the dice being

thrown in the game. *Id.* He estimated there were ten people playing in the game, and another 20 around the area who were not shooting dice. *Id.* at 14.

Walker stated that he was eight feet away from Petitioner when Petitioner said he was going to rob the dice game. *Id.* at 13. Walker explained that Petitioner had been losing in the dice game, and appeared angry when he threatened to rob the game. *Id.* Walker believed that Petitioner was "just playing" when he threatened to rob the game. *Id.*

Walker witnessed Petitioner walk away from the game, and return with a revolver. *Id.* He claimed that Petitioner did not have a mask, but Petitioner had a hood on. *Id.* at 14. He then witnessed the victim and Petitioner walk away from the game towards the van. *Id.* at 13. Walker heard a pow and saw the victim fall to the ground. *Id.* Walker identified Petitioner as the offender in a lineup a week after the shooting. *Id.*

Walker admitted to having several prior convictions including resisting a peace officer, obstructing justice, obstructing service of process, unlawful delivery of a controlled substance, burglary, and aggravated fleeing and eluding of a police officer. *Id.* at 13-14. Walker did not speak to the police until a week after the shooting when he was arrested for domestic battery. *Id.* at 14. He told the officers that he had information regarding the shooting. *Id.* Walker explained that he feared that the police would find out that he had an outstanding warrant if he spoke to them on his own regarding the shooting. *Id.*

Keisha Ligon, a complex resident, returned to her home between two and three a.m. from a road trip. *Id.* at 10. Ligon witnessed several people outside the apartment including those playing in the dice game. *Id.* She witnessed Petitioner at the dice game. *Id.* She went into her apartment and then heard a pow approximately five minutes later. *Id.* Ligon later identified Petitioner in a police photo lineup. *Id.*

Lawana Butler, a complex resident, was watching a movie in her apartment with her cousin Victoria around midnight on the morning of the shooting. *Id.* at 11. Petitioner's brother, Patrick Calabrese, who was drunk, entered into Butler's apartment. *Id.* at 11-12. Butler and Victoria helped Patrick Calabrese up the apartment stairs and into a bed in Victoria's bedroom. *Id.* at 12. Butler then went to her own bed and fell asleep. *Id.* She was awoken by the sound of a gunshot. *Id.* Butler ran into Victoria's room to look outside the window to see what had happened. *Id.* Butler tripped over Patrick Calabrese, who was naked and asleep on Victoria's bedroom floor, when she came into the bedroom. *Id.*

Patrick Calabrese's phone began to ring, and Butler brought the phone to him. *Id.* Butler spoke briefly to the person calling on Patrick Calabrese's phone, but she did not recognize the caller. *Id.* Patrick Calabrese left the apartment the next morning at 8:00 a.m. *Id.*

Outside the presence of the jury, Patrick Calabrese's attorney informed the trial court that Patrick Calabrese intended to invoke his Fifth Amendment rights if he was called to testify. *Id.* at 15. The prosecution responded by granting Patrick Calabrese immunity from prosecution associated with his testimony. *Id.* Patrick Calabrese was called to testify outside the presence of the jury. *Id.* However, he still invoked his Fifth Amendment rights resulting in the trial court finding him in contempt. *Id.*

The prosecution argued that it should be allowed to call Patrick Calabrese to testify in front of the jury because the defense had suggested in its opening argument and questioning of witnesses that Patrick Calabrese was responsible for the shooting. *Id.* Over Petitioner's objection, the trial court allowed the prosecution to call Patrick Calabrese to testify before the jury. *Id.* Patrick Calabrese again invoked his Fifth Amendment rights, this time before the jury. *Id.*

Carpentersville police officer John Galason testified that he interviewed Rudy Marcial on the day of the shooting. *Id.* at 16. However, Galason concluded that Marcial was not the shooter based on

the descriptions given to the police. *Id.* Marcial's hair was longer than the shooter's hair length according to the eyewitnesses. *Id.* Marcial was not placed in a physical lineup, and Galason was uncertain if Marcial's picture was put in any photo lines. *Id.*

The defense also called Carpentersville police officer Grant Gerleman. Gerleman testified that he presented witness LeFlore with the photo lineups the day after the shooting. *Id.* at 16. He explained that the LeFlore did not pick anyone from the first two photo lines that Gerleman showed him. *Id.* However, LeFlore did mark three men who could have been the shooter in a third photo array. *Id.* Gerleman conceded that he only marked Petitioner's picture on the array and did not note the other two. *Id.*

Carpentersville police detective John Spencer was called by the defense and testified that he was assigned to investigate Walker as a possible suspect for the shooting. *Id.* Spencer explained that his investigation eliminated Walker as a suspect. *Id.*

Petitioner's mother testified that Petitioner was right handed. *Id.* Witness Lewis testified that she saw Petitioner shoot the victim using a gun in his left hand. *Id.* at 12.

Carpentersville police officer Polarski testified that he initially interviewed LeFlore. *Id.* LeFlore only told Polarski that he saw someone running from the scene, but did not tell Polarski that he saw the shooter. *Id.* Polarski explained that he was a patrol officer, and his job was to take contact information from witnesses so that detectives could conduct follow up interviews. *Id.* at 16-17.

The jury found Petitioner guilty, and he was sentenced to 70 years of imprisonment. *Id.* at 17, 23. The Illinois courts affirmed his conviction on direct review, and rejected his postconviction petition. He now brings the present habeas corpus petition.

## 2.    Petitioner's Claims

### A.    The AEDPA Standard

A writ of habeas corpus cannot issue unless Petitioner demonstrates that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). As the state courts adjudicated Petitioner's claims on the merits, the Court's review of the present habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d).

"'A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "An 'unreasonable application' occurs when a state court 'identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of Petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (opinion of O'Connor, J.)).

Clearly established federal law is the "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). The state court is not required to cite to, or even be aware of, the controlling Supreme Court standard, as long as the state court does not contradict the Supreme Court standard.  *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court begins with a presumption that state

courts both know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). This presumption is especially strong when the state court is considering well established legal principles that have been routinely applied in criminal cases for many years. *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

The Court's analysis is "backward looking." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). The Court is limited to reviewing the record before the state court at the time that court made its decision. *Id.* The Court is also limited in considering the Supreme Court's "precedents as of 'the time the state court renders its decision.'" *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Cullen*, 562 U.S. at 182; *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (emphasis omitted).

"The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1702 (2014); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181 (quoting *Woodford*, 537 U.S. at 24).

**B.     Claim One:   Prosecution Calling Patrick Calabrese to Testify**

Petitioner argues that the trial court erred in allowing the prosecutor to call Patrick Calabrese to testify before the jury. As Patrick Calabrese had previously invoked his Fifth Amendment rights when called to testify outside the presence of the jury, Petitioner believes it was self-evident that Patrick Calabrese would reassert the Fifth Amendment when called before the jury.

### 1.      Respondent's Non Cognizable Argument

Respondent cites to *Namet v. United States*, 373 U.S. 179 (1963), in support of the argument that Petitioner's claim is non cognizable. *Namet* explained that the lower federal courts at that time had suggested that calling the witness to testify knowing he would invoke his Fifth Amendment rights could result in error in two ways. First, there was a view that it was prosecutorial misconduct when the prosecutor made a conscious and flagrant attempt to build a case based on inferences arising from the witness's invocation of the Fifth Amendment privilege. 373 U.S. at 186. The second view was that there was a Confrontation Clause issue because the inference caused by the witness invoking the Fifth Amendment was not subject to cross-examination. 373 U.S. at 187.

Despite discussing these two principles of prosecutorial misconduct and the Confrontation Clause, *Namet* was clear that was "not pass[ing] upon the correctness of the several lower court decisions. . . ." *Id.* Instead, *Namet* explained that facts of that particular case were limited to considering whether allowing the prosecution to call the witness was an evidentiary error. 373 U.S. at 185; *see also Busby v. Holt*, 781 F.2d 1475, 1476 n.1 (11th Cir. 1986); *Cagno v. Administrator, New Jersey State Prison*, __ Fed. App. __, No. 14-406, 2016 WL 732073, at *4 n.10 (3d Cir. Feb. 24, 2016) (non precedential opinion).

As *Namet* limited the case to considering the issue from an evidentiary perspective, Respondent argues that this makes a *Namet* based claim non cognizable. It is true that evidentiary issues are traditionally not cognizable in a habeas corpus proceeding because they raise questions of state law. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). However, two years after *Namet*, the Supreme Court articulated a limited circumstance when a Confrontation Clause violation is a viable constitutional claim.

In *Douglas v. Alabama*, 380 U.S. 415 (1965). the Supreme Court held that *Namet's* Confrontation

Clause standard sets forth a constitutional claim. 380 U.S. at 420; *see also Bushy*, 781 F.3d at 1476 n.1;

*Ziegler v. Callahan*, 659 F.2d 254, 272 n.12 (1st Cir. 1980)); *Cagno*, __ Fed. App. __, No. 14-406, 2016

WL 732073, at *5.[1] Under *Douglas / Namet*, calling a witness to testify knowing that he will invoke his

Fifth Amendment rights would result in a constitutional violation if the "'inferences from a witness'

refusal to answer added critical weight to the prosecution's case in a form not subject to

cross-examination, and thus unfairly prejudiced the defendant.'" 380 U.S. at 420 (quoting *Namet*, 373

U.S. at 187). Therefore, Petitioner states a cognizable federal claim in his habeas corpus petition.

## 2.     Respondent's Fair Presentment Argument

Respondent argues in the alternative that even if there is a federal claim, (and there is under

*Douglas / Namet*), Petitioner failed to properly raise the federal nature of the claim in the state courts.

This Court disagrees.

To preserve the claim for his habeas corpus petition, Petitioner had to present the federal

nature of this claim to the state court so that the state court could adjudicate the federal issue.

*Villanueva v. Anglin*, 719 F.3d 769, 775 (7th Cir. 2013) (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982)

(per curiam); *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)). Petitioner did this by citing to

*Namet*, and asserting the relevant *Namet* standard in his briefs in the state courts. [14-1 at 48, 83, 161,

172]. It is true that Petitioner did not cite to the Confrontation Clause or Sixth Amendment in his state

court filings, but he is not required to cite "'book and verse' of the Constitution" to fairly present his

claim to the state courts. *Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007) (citing *Picard v. Connor*,

---

1 *Douglas* has two holdings: (1) the Sixth Amendment Confrontation Clause is applicable to the States; and, (2) the defendant's Sixth Amendment confrontation rights were violated in that case when applying the standard from *Namet*. Although it is *Douglas* that recognized the constitutional nature of the *Namet* claim, *Namet* is the case that is traditionally cited for the source of the constitutional claim despite the fact that *Namet* technically did not reach the constitutional issue. *See Harmon v. McVicar*, 95 F.3d 620, 624 (7th Cir. 1996) (citing to *Namet*).

404 U.S. 270, 278 (1971)). Petitioner cited the controlling Supreme Court case, set forth the controlling constitutional standard, and asserted that his case fits the relevant fact pattern for this type of constitutional claim in the state courts. This was more than enough to preserve the claim for the present habeas corpus petition.

### 3. The Merits of Petitioner's Claim

Respondent failed to answer the claim on the merits. Despite this, Petitioner is not entitled to relief. Petitioner has the burden of showing that he is being held in violation of his constitutional rights, and that he is entitled to relief under the demanding AEDPA standard. 28 U.S.C. § 2254(a); *Cullen*, 563 U.S. at 181. He has not met this burden.

The relevant state court decision is the Appellate Court of Illinois's on direct appeal as it was the last state court decision to evaluate Petitioner's claim on the merits. *Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016) (citations omitted). Petitioner is not entitled to relief because the state appellate court decision is neither contrary to, nor an unreasonable application of, clearly established federal law under *Namet / Douglas*.

As mentioned above, *Douglas* constitutionalized only the second *Namet* principle that calling a witness to testify knowing that he will invoke his Fifth Amendment rights results in a constitutional violation if the "'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" 380 U.S. at 420 (quoting *Namet*, 373 U.S. at 187). The first *Namet* principle, that it is prosecutorial misconduct when the prosecutor made a conscious and flagrant attempt to build a case based on inferences arising from a witness's invocation of the Fifth Amendment privilege, 373 U.S. at 186, is not clearly established federal law from the Supreme Court. As *Namet* explained, it was reviewing the decisions of the lower federal courts when discussing these two principles in that case. Clearly established federal

law under the AEDPA is limited solely to Supreme Court holdings. *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam). By not addressing the first principle *Douglas* only made the second *Namet* principle into clearly established federal. To the Court's knowledge, the Supreme Court has never constitutionalized the first *Namet* principle in one of its holdings.

The state appellate court identified both *Namet* principles in its decision. *Calabrese*, 924 N.E.2d at 28 (citing *Illinois v. Izquierdo*, 634 N.E.2d 1266, 1270 (Ill. App. Ct. 1994) ("It will be reversible error if the State makes an obvious attempt to build its case out of inferences arising from the privilege or if the witness's refusal to testify adds critical weight to the State's case."")). As mentioned above, Petitioner can only seek relief under the second *Namet* principle under *Douglas*.

The fact that the state appellate court decision did not track *Namet* and *Douglas* verbatim is of no moment. A state court's "short-hand" recitation of the controlling constitutional standard is permissible as along as the opinion does not suggest that the state court identified the wrong constitutional standard. *Sussman v. Jenkins*, 636 F.3d 329, 360 (7th Cir. 2011) (citing *Woods v. Schwartz*, 589 F.3d 368, 378 n.3 (7th Cir. 2009)). State courts are presumed to know and properly follow the law so there is no requirement that they cite to, or quote verbatim, the controlling Supreme Court precedent. *Woodford*, 537 U.S. at 24; *Early*, 537 U.S. at 8. Relief is only available if the state court identifies the wrong law, and that did not occur in this case.

The state appellate court cited to the state appellate court case of *Illinois v. Izquierdo* to support its recitation of the controlling legal standard. *Izquierdo* cites to *Illinois v. Crawford Distributing Co., Inc.*, 397 N.E.2d 1362 (Ill. 1979), which cites to, and sets forth, the *Namet* standards. *See Crawford Distributing Co., Inc.*, 397 N.E.2d at 1365 (citing *Namet*, 373 U.S. at 186-87). This further demonstrates that the state court identified the proper federal standard. The relevant state appellate court decision is not contrary to the controlling Supreme Court precedent.

13

The state appellate court decision also did not make an unreasonable application of the *Namet / Douglas* principle in Petitioner's case. The state court decision, *Calabrese*, 924 N.E.2d at 28, properly recognized that Patrick Calabrese's invocation of his Fifth Amendment rights before the jury did not add "'critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" *Douglas* 380 U.S. at 420 (quoting *Namet*, 373 U.S. at 187).

As the state appellate court explained, Patrick Calabrese was a minor portion of the overall case against Petitioner. There were three separate witnesses (LeFlore, Walker, and Lewis), who all witnessed Petitioner shoot the victim, and a fourth witness, Ligon, placed Petitioner at the dice game shortly before the shooting.

Petitioner counters that these eyewitnesses are unreliable because several of them had prior convictions, were consuming drugs and/or alcohol, and did not originally tell the police that they had witnessed the shooting. The issue of witness credibility was presented to the jury. The jury chose to find the witnesses credible and convict Petitioner. The Court has no license to reject the jury's credibility determinations. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

There are four independent witnesses, three of whom testified that Petitioner shot the victim, and a fourth who placed Petitioner at the scene shortly before the shooting. A single eyewitness is sufficient evidence to support a conviction. *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009). As the state appellate court recognized, Patrick Calabrese's invocation of the Fifth Amendment before the jury was of minimal relevance to the case, and was not of "critical weight" that caused "undue prejudice" to Petitioner. He is a marginal part of the case when compared to the other witnesses who testified that they saw Petitioner shoot the victim.

Furthermore, any inference from Patrick Calabrese's Fifth Amendment invocation could have been interpreted against either party. One view is that Patrick Calabrese was invoking the Fifth

Amendment in an attempt to protect his brother. However, an equally plausible inference is that Patrick Calabrese invoked the Fifth Amendment to protect himself (which would have supported the defense's suggestion that Patrick Calabrese committed the crime). There is nothing in the case that links Patrick Calabrese's invocation of his Fifth Amendment rights to Petitioner. The state appellate court ruling was proper, and Petitioner cannot demonstrate that the state court ruling was contrary to, or an unreasonable application of, clearly established federal law.[2]

### C.   Claim Two:   Petitioner's Ineffective Assistance of Appellate Counsel Claim

Petitioner's other claim is that his appellate counsel was ineffective on direct appeal for failing to raise the following issues: (a) the trial court's denial of a cross-racial identification jury instruction; (b) the trial court's refusal to allow Petitioner to introduce Cedric Walker's prior convictions for impeachment purposes; (c) destruction of exculpatory evidence by Detective Gerleman; (d) Detective Galason's perjured testimony; and, (e) the state's withholding of material evidence. Respondent counters that the claim is procedurally defaulted.

Petitioner's ineffective assistance of appellate counsel arguments were raised in his state postconviction petition. [14-3 at 525-533]. The postconviction petition was dismissed by the state trial court. [14-3 at 563]. Petitioner appealed the denial to the state appellate court where he was initially represented by the state appellate defender's office, but he subsequently received leave to proceed *pro*

---

2 Contrasting the present case to *Douglas v. Alabama* demonstrates the marginal nature of Patrick Calabrese's invocation of the Fifth Amendment to the case, and how the record does not suggest that the inference was used against Petitioner. In *Douglas*, the prosecutor read a co-defendant's confession before the jury and attempted to question the co-defendant about the confession. 380 U.S. at 416. The co-defendant invoked his Fifth Amendment rights when questioned by the prosecutor about the confession. *Id.* The defendants in *Douglas* were charged with assault with intent to murder. *Id.* The co-defendant's confession violated the defendant's rights because it provided the "crucial[ly] importan[t]" evidence of naming the defendant as the one who fired the shotgun blast that wounded the victim. *Id.* Unlike in *Douglas* where the co-defendant invoked his Fifth Amendment rights when being questioned about the critically important issue of his confession that identified the defendant as committing the crime, here, Patrick Calabrese's invocation of his Fifth Amendment rights had little to no impact on the case.

*se.* [14-2 at 4-11]. The state appellate court then set a briefing schedule for Petitioner to file his *pro se* brief. [14-2 at 13].

Petitioner responded by filing a motion seeking the appointment of counsel other than the state appellate defender. [14-2 at 15-52]. The motion seeking new appellate counsel also included a discussion of the underlying merits of his case. The state appellate court denied the motion for new counsel [14-2 at 54]. The appellate court again ordered Petitioner to file his appellate brief. [14-2 at 56].

Petitioner responded by filing a motion in argument. [14-2 at 58-88]. This motion again raised the underlying merits of his case, but was not in the form of an appellate brief. The appellate court once again rejected the motion, and ordered Petitioner to file an appellate brief. [14-2 at 90]. Petitioner did not comply, and so the appellate court dismissed the appeal because of Petitioner's failure to file the required brief. [14-2 at 94].

Petitioner's claim is procedurally defaulted because the state appellate court's dismissal was based upon an adequate and independent state procedural ground. "As a rule, a state prisoner's habeas claims may not be entertained by a federal court 'when (1) a state court has declined to address those claims because the prisoner has failed to a meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds.'" *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) (quoting *Walker v. Martin*, 562 U.S 307, 315 (2011); *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)). The Court must look to the "nature of the disposition" and the "surrounding circumstances" to determine whether the state court relied on an independent and adequate state law ground in disposing of the claim. *Yist v. Nunnemaker*, 501 U.S. 797, 802 (1991); *Woods v. Schwartz*, 589 F.3d 368, 375 (7th Cir. 2009).

To be independent, the state court must have actually relied upon the procedural bar as an independent basis for the disposition of the case. *Lee v. Foster*, 750 F.3d 687, 693 (7th Cir. 2014)

(citation omitted). It is clear that the state appellate court relied upon Illinois Supreme Court Rule 341 that sets forth the required components of a brief on appeal. (The requirements of Supreme Court Rule 341 are applied to criminal cases via Rule 612(i)). Petitioner failed to file a brief, despite several orders from the state appellate court, instead seeking to raise his claims in a motion. The failure to follow Supreme Court Rules regarding the filing of briefs in support of an appeal is sufficient grounds under Illinois law to dismiss an appeal (including a *pro se* appeal brought in a criminal case). *Illinois v. Bebato*, No. 2014 IL App (1st) 130563-U, 2014 IL 5823094, at *1 (Ill. App. Ct. Nov. 10, 2014).

To be adequate, the state rule must be "'firmly established and regularly followed.'" *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)). Illinois Supreme Court Rule 341 is sufficiently established to allow the procedural default finding. *Brown v. Chandler*, No. 05 C 2609, 2013 WL 6198182, at *7 (N.D. Ill. Nov. 27, 2013) (finding procedural default for failing to follow Rule 341). Claim Two is procedurally defaulted.

Petitioner cannot excuse his procedural default through cause and prejudice, or fundamental miscarriage of justice. Respondent raised the procedural default argument in his answer. [13]. Petitioner failed to file a reply to Respondent's answer, in which he could have brought his cause and prejudice, or fundamental miscarriage of justice argument, despite being given a chance by the Court to file a reply. Thus, Petitioner is barred from attempting to excuse his procedural default of Claim Two. *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 555 n.6 (7th Cir. 2001). For completeness purposes, however, the Court also notes that even if the forfeiture for failing to respond to Respondent's default argument was forgiven, Petitioner could not excuse his defaults under either cause and prejudice, or fundamental miscarriage of justice.

Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465

(7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two types of cause are not applicable to this case. Regarding ineffective assistance of counsel to excuse the default, Petitioner does not raise a separate claim in his present habeas corpus. Additionally, the principles set forth in *Maples v. Thomas*, 132 S. Ct. 912 (2012), *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), are inapplicable because it was Petitioner's own failure to comply with the Illinois Supreme Court Rules when proceeding *pro se* on appeal that resulted in the default.

This leaves Petitioner with the fundamental miscarriage of justice (actual innocence) gateway to excuse his default. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 133 S. Ct. at 1928 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). Petitioner presents no new evidence to suggest he is actually innocent. His petition simply reargues the trial court evidence and suggests that

the eyewitnesses should not be believed. This is insufficient to demonstrate actual innocence. Petitioner cannot excuse his procedural default.[3]

Nevertheless, for completeness purposes, even if Petitioner could excuse his procedural default, he would be unable to obtain relief under *Strickland v. Washington*, 466 U.S. 668 (1984). The state trial court's ruling is the last ruling on the merits of Petitioner's claim. Although it is not an elaborate opinion, it is still a ruling on the merits and therefore receives AEDPA deference. *Harrington*, 562 U.S. at 98-99. There is no *Strickland* violation in this case, and Petitioner cannot meet the demanding AEDPA standard. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (explaining that as *Strickland* and the AEDPA are both deferential standards, the Court must apply a doubly deferential standard when reviewing a state court's adjudication of a *Strickland* claim).

Petitioner can demonstrate neither deficient performance nor prejudice. *Premo*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). Regarding performance, Petitioner received competent representation on direct appeal when viewing counsel's performance as a whole as required. *Brown v. Finnan*, 598 F.3d 416, 422 (7th Cir. 2010). Appellate counsel raised the jury selection process, the sufficiency of the evidence, the decision to allow Patrick Calabrese to take the stand and invoke his Fifth Amendment rights, and Petitioner's sentence as issues on appeal. Limiting an appeal to the strongest issues is a valid exercise of strategy. *See United States v. Stokes*, 726 F.3d 880, 887 (7th Cir. 2013) (cautioning against taking a "shotgun" approach of raising every possible claim on appeal as doing so runs the risk of distracting the reviewing court from the most important issues). Furthermore, Petitioner cannot demonstrate prejudice, as explained above, because several

---

3 It is true that Petitioner asserted his underlying claims in his motion for new counsel, and motion in argument. The state appellate court denied both motions and instructed Petitioner to file his merits brief. Petitioner failed to comply with the Illinois Supreme Court Rules and the instructions of the state appellate court to file a merits brief. The state appellate court dismissed Petitioner's appeal based on his repeated failure to file a merits brief. The state appellate court was not required to look beyond the lack of a merits brief to the record as a whole to find Petitioner's claim. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Petitioner's claim is procedurally defaulted because he failed to raise it in the required merits brief by the established state court rules.

eyewitnesses saw him shoot the victim and heard him say that he was going to rob the dice game winner prior to the shooting.

Counsel also cannot be faulted for failing to raise the individual arguments that Petitioner asserts because they are meritless. There was no reason for counsel to challenge the trial court's denial of a cross-racial identification jury instruction because there is no right to that instruction under Illinois law. *Illinois v. Martin*, No. 1-09-0966, 2011 WL 9688230, at *9-*11 (Ill. App. Ct. June 14, 2011).

Regarding the trial court's exclusion of witness Cedric Walker's aggravated domestic battery and domestic violence convictions, the jury did hear of Walker's convictions for resisting a peace officer, obstructing justice, obstructing service of process, unlawful delivery of a controlled substance, burglary, and aggravated fleeing and eluding of a police officer. *Calabrese*, 924 N.E.2d at 13-14. The aggravated domestic battery and domestic violence convictions are simply cumulative of the evidence that was already before the jury.

Petitioner argues that Officer Gerleman wrongfully destroyed the photo array that was shown to LeFlore. LeFlore identified two other possible suspects, in addition to Petitioner, in one of the photo lines. However, Gereleman allegedly did not preserve that array. Petitioner argues that this hindered his ability to present his defense because he could not investigate these other suspects.

"A police officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith." *Hart v. Mannina*, 798 F.3d 578, 589 (7th Cir. 2015) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). Despite picking more than one potential suspect (including Petitioner's picture), LeFlore testified in Court that Petitioner was the shooter. The jury also heard that LeFlore picked two other pictures as possible suspects. Thus, the matter of two other possible suspects picked by LeFlore was before the jury. Counsel was not ineffective for failing to raise the issue on appeal.

Furthermore, any argument regarding the photo array does not offset the fact that two other witnesses (beside LeFlore) testified that Petitioner was the shooter, and a third witness put him at the murder scene. There is nothing to indicate that the photo array was exculpatory, or that Officer Gerleman destroyed it in bad faith.

Petitioner also argues that perjured testimony was used at his case. The issue involves a discrepancy between the testimonies of Officer Galason and LeFlore. Galason testified that LeFlore told him during the initial investigation that he saw man standing by the dice game who was known as "Big Pun." LeFlore denied this at trial.

To assert a claim of a knowing use of perjured testimony, Petitioner must show: (1) there was perjured testimony used in the prosecutor's case; (2) the prosecution knew, or should have known it was perjured testimony; and, (3) there is a reasonable likelihood that the false testimony affected the jury verdict. *Napue v. Illinois*, 360 U.S. 1173 (1959); *Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014).

There is no indication that the prosecution knowingly used perjured testimony. Petitioner is raising an inconsistency between two witnesses. A mere inconsistency in the testimony of two witnesses does not establish the use of perjured testimony. *Ashburn v. Korte*, 761 F.3d at 757-58. Furthermore, this discrepancy in testimony would not have impacted the verdict. The inconsistency was presented to the jury, the jury heard from LeFlore, who identified Petitioner as the shooter, and two other witnesses in addition to LeFlore also identified Petitioner as the shooter. Counsel was not ineffective for failing to raise it on appeal.

Petitioner's final argument is associated with the prior argument regarding LeFlore's identification of two other possible suspects in the photo arrays. He believes the failure to disclose these two other potential suspects is a violation under *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner's attorney cannot be faulted for failing to raise the issue on appeal. There is no *Brady* claim because the

issue was raised during the trial. *United States v. Dixon*, 790 F.3d 758, 759 (7th Cir. 2015) ("Because this potentially exculpatory fact was disclosed in time to be used at trial, *Brady* has been satisfied."). Furthermore, as previously explained, LeFlore explained that he identified three possible suspects in the photo arrays (including Petitioner). LeFlore (along with two other witnesses) identified Petitioner as the shooter in their trial testimony. Petitioner cannot show the required prejudice element of a *Brady* claim in light of the other overwhelming evidence. *Strickler v. Greene*, 527 U.S. 263, 290.

Claim Two is procedurally defaulted. Regardless, the claim is also meritless under *Strickland*, and Petitioner certainly cannot satisfy the demanding ADPEA standard. Accordingly, Claim Two is denied. The habeas corpus petition is denied on the merits.

## C.    **Certificate of Appealabilty**

The Court declines to issue a certificate of appealability under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of this case. *Resendez v. Knight*, 653 F.3d 445, 446-47 (7th Cir. 2011) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R.

App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**D.     Conclusion**

Petitioner's habeas corpus petition [1] is denied on the merits. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. On the Court's own motion, Respondent Rick Harrington is terminated. Kim Butler, Warden, Menard Correctional Center, is added as Respondent. The Clerk shall alter the case caption to *Calabrese v. Butler*. Civil Case Terminated.

ENTERED:

Dated: June 1, 2016

_____
SHARON JOHNSON COLEMAN
United States District Judge